**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

JOSHUA BRADLEY,

          Plaintiff,

    v.

S.C. BOYS, INC., d/b/a CHAMPS
SPORTS BAR or CHAMPS
DOWNTOWN; SCOTT LUCCHESI;
and THOMAS WALKER,

          Defendants.

No. 4:20-CV-00262

(Chief Judge Brann)

**MEMORANDUM OPINION**

**JULY 29, 2022**

## I.    BACKGROUND

On February 13, 2020, Plaintiff Joshua Bradley filed a five-count complaint against Defendants S.C. Boys, Inc., Scott Lucchesi, and Thomas Walker.  Bradley alleges that Defendants violated the Fair Labor Standards Act ("FLSA") and the Pennsylvania Minimum Wage Act ("PMWA") by not paying him overtime compensation.  Bradley also claims retaliation under the FLSA.  Finally, Bradley alleges that Defendants violated the Pennsylvania Wage Payment and Collection Law ("WPCL") and breached a contract by not giving sixty days' notice before termination.

Several motions are now ripe for disposition.  For the following reasons, Bradley's motion to strike Defendants' expert report and expert witness is denied in

part and granted in part.  Defendants' motion to strike Bradley's counterstatement of material facts is denied.  And Defendants' motion for summary judgment is denied in part and granted in part.

## II.   FACTS

Joshua Bradley lives in Williamsburg, Pennsylvania.[1]  Bradley worked at other restaurants before Scott Lucchesi hired him at Champs Sports Bar in Altoona, Pennsylvania ("Champs Altoona") in October 2015.[2]  There, Defendants expected Bradley to work fifty to sixty hours a week.[3]

Lucchesi co-owns Champs Altoona and two restaurants in State College, Pennsylvania: Champs Downtown and Champs Sports Bar on North Atherton ("Champs on North Atherton").[4]  Thomas Walker co-owns these two State College restaurants and is a manager at Champs on North Atherton.[5]  Walker's responsibilities are managing the kitchen and overseeing the entire restaurant.[6]

In the fall of 2016, Bradley transferred from Champs Altoona to Champs Downtown.[7]  This transfer did not change Bradley's job duties.[8]  To monitor Bradley's hours, Champs required Bradley to clock in and clock out.[9]

---

[1]   Doc. 49-1 at ¶ 8.
[2]   *Id.* at ¶ 57.
[3]   *Id.* at ¶ 61.
[4]   *Id.* at ¶ 32.
[5]   *Id.* at ¶ 44–45.
[6]   *Id.* at ¶ 46.
[7]   *Id.* at ¶ 63.
[8]   *Id.* at ¶ 64.
[9]   *Id.* at ¶ 65.

Then Bradley moved to Champs on North Atherton, where he reported to the owners, including Walker and Neil Fletcher.[10]  After six or seven months, Bradley returned to Champs Downtown.[11]  There, Bradley helped complete orders, prepare employees' schedules, and ensure that other cooking stations were working properly.[12]

Eventually, Bradley proposed work schedules subject to review by upper management.[13]  Bradley would also review the inventory, recommend produce and food orders, contact suppliers, and verify deliveries.[14]  Bradley could also recommend that Defendants discipline other employees.[15]

Upon Bradley's suggestion, Champs Downtown hired Walter Weaver.[16]  At some point, Weaver complained about unpaid wages.[17]  So Weaver received a lump-sum payment for overtime-compensation wages.[18]

During a meeting, Lucchesi and Walker advised Bradley that they had decided to "go in a different direction" at Champs Downtown.[19]  So Bradley filed suit on February 13, 2020.[20]

---

[10]  *Id.* at ¶ 73.
[11]  *Id.* at ¶ 74.
[12]  *Id.* at ¶ 75.
[13]  *Id.* at ¶ 77.
[14]  *Id.* at ¶ 78.
[15]  *Id.* at ¶ 81.
[16]  *Id.* at ¶ 83.
[17]  *Id.* at ¶ 95.
[18]  *Id.* at ¶ 96.
[19]  *Id.* at ¶ 93.
[20]  Doc. 1.

Bradley claims that Defendants violated the FLSA and PMWA by not paying him overtime.[21]  He also claims that Defendants violated the FLSA by terminating him for engaging in protected activity.[22]  Finally, Bradley claims that Defendants violated the WPCL and breached a contract by not giving sixty days' notice before termination.[23]

## III.   MOTION TO STRIKE EXPERT REPORT & EXPERT WITNESS

First, Bradley moves to strike Defendants' expert report and expert witness, Alicia Silverman.  Having fully briefed this issue and explained the basis of Silverman's testimony, the parties do not request a *Daubert* hearing.[24]  The Court does not see the need for a *Daubert* hearing either.[25]  Accordingly, the Court will proceed to determine the admissibility of Silverman's testimony.

In sum, Bradley's motion to strike is denied in part and granted in part.  Silverman may explain the restaurant industry's standards and customs.  But she

---

[21]  *Id.* at 8–10.

[22]  *Id.* at 7–8.

[23]  *Id.* at 10.

[24]  *See* Docs. 46, 46-2, 47, 48, 51.

[25]  *See Senese v. Liberty Mut. Ins. Co.*, 661 F. App'x 771, 775–76 (3d Cir. 2016) ("Finally, the District Court did not abuse its discretion in declining to hold a *Daubert* hearing before deciding to exclude Rickard's testimony. This Court has upheld a district court's decision not to hold a *Daubert* hearing where the basis for the expert's testimony was clear and the record was adequate to support a determination on admissibility. Here, the District Court had all the evidence it needed to resolve the evidentiary issues before it because Senese had more than 'ample opportunity to explain to the Court the basis for Rickard's opinions, through the submission of two expert reports and two briefs.'") (citation omitted); *Doe v. New Jersey Dep't of Corr.*, 337 F. App'x 220, 226 (3d Cir. 2009) ("Because Fletcher was a non-party witness, . . . the District Court committed no error in not *sua sponte* holding a hearing on her testimony."); *Oddi v. Ford Motor Co.*, 234 F.3d 136, 153 (3d Cir. 2000) ("The district court therefore apparently saw no need to conduct a hearing before ruling on the *Daubert* challenges. This is consistent with *Padillas* and perfectly appropriate under *Kumho Tire*.") (citations omitted).

may not testify that Bradley was not entitled to overtime or that he served in management or executive positions.  Nor may Silverman testify as to Bradley's credibility.

### A.    Standard of Review

"Whether to permit expert testimony on a particular issue is left to the discretion of the trial court."[26]  "Under the Federal Rules of Evidence, it is the role of the trial judge to act as a 'gatekeeper' to ensure that any and all expert testimony or evidence is not only relevant, but also reliable."[27]   "The Rules of Evidence embody a strong and undeniable preference for admitting any evidence which has the potential for assisting the trier of fact."[28]

"Rule 702, which governs the admissibility of expert testimony, has a liberal policy of admissibility."[29]  Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

---

[26]   *Coregis Ins. Co. v. City of Harrisburg*, No. CIV.A. 1:03-CV-920, 2005 WL 2990694, at *2 (M.D. Pa. Nov. 8, 2005).

[27]   *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997), *as amended* (Dec. 12, 1997) (citation omitted).

[28]   *Id.*

[29]   *Id.*

## B.   Analysis

### 1.   Industry Standards

"[T]he text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience."[30]  "But, at a minimum, a [proffered] expert witness . . . must possess skill or knowledge greater than the average layman . . . ."[31]  Here, Silverman claims more than twenty-five years of experience in the restaurant industry, managing multi-location restaurants and supervising hundreds of subordinate managers, supervisors, and employees.[32]  Such experience indicates that Silverman knows more about the restaurant industry's standards and customs than the average layman.  Accordingly, Silverman is qualified to testify about the restaurant industry's standards and customs.

Moreover, the FLSA's executive exemption considers whether the employee manages "a customarily recognized department or subdivision."[33]  This explicitly references the restaurant industry's customs.  So Silverman's knowledge and experience may help the trier of fact better understand evidence about the restaurant industry's customs, a fact in issue.[34]

---

[30]   Fed. R. Evid. 702 advisory committee's note to 2000 amendment.
[31]   *Aloe Coal Co. v. Clark Equip. Co.*, 816 F.2d 110, 114 (3d Cir. 1987).
[32]   Doc. 46-2 at 4.
[33]   29 C.F.R. § 541.100(a).
[34]   *See* Doc. 52 at 11 ("Here, Mr. Bradley's employment does not satisfy the second, third, or fourth prong to be properly exempt from overtime compensation.").

Silverman also explains that she reviewed and analyzed "information exchanged among the parties during discovery in this case to date, including the transcripts of the depositions of Joshua Bradley, Alicia Bradley, Walter Weaver, Scott Lucchesi and Thomas Walker."[35]  Then Silverman "evaluated this information in the context of standard practices within the restaurant industry of which [she has] become aware, and which [she has] utilized, during [her] career of more than 20 years in the industry."[36]  This explains how Silverman's experience reliably informs her testimony about the restaurant industry's standards.[37]

Indeed, federal courts have similarly permitted experts to testify about industry standards.[38]    Following this persuasive authority, the Court admits Silverman's expert testimony about the restaurant industry's standards.  Bradley's

---

[35] Doc. 46-2 at 3.

[36] *Id.*

[37] *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) ("In other cases, the relevant reliability concerns may focus upon personal knowledge or experience."); Fed. R. Evid. 702 advisory committee's note to 2000 amendment ("If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.").

[38] *See Wagner v. Progressive Corp.*, No. 5:20-CV-05407-JMG, 2021 WL 6137027, at *2 (E.D. Pa. Dec. 29, 2021) ("However, Setcavage relies on his personal knowledge and experience in addition to referencing the regulations and standards governing the industry. Setcavage has handled or supervised the handling of, approximately 25,000 automobile insurance claims over two decades."); *U.S. ex rel. Emanuele v. Medicor Assocs.*, No. CV 10-245 ERIE, 2017 WL 1073270, at *5 (W.D. Pa. Mar. 21, 2017) ("Such is the situation here, where McNamara's experienced discussion of standards and practices in the health care industry may prove helpful to the average juror . . . ."); *In re Wellbutrin SR Antitrust Litig.*, No. CIV.A. 04-5525, 2010 WL 8425189, at *2 (E.D. Pa. Mar. 31, 2010) ("Similarly, expert testimony is properly admitted to explain custom in a given field . . . .").

motion to strike is therefore denied as to the "Industry Standards" portion of Silverman's expert report.

### 2.    Legal Conclusions

Silverman concludes that "Plaintiff was employed as a Kitchen Manager and, thus, appropriately classified and treated as an exempt executive by Defendants; and that, accordingly, he was not entitled to overtime compensation."[39]  "But an expert cannot testify to the legal conclusion of whether" Bradley was entitled to overtime compensation.[40]  Accordingly, this legal conclusion regarding Bradley's entitlement to overtime compensation is stricken.

Silverman also opines that Bradley "was always treated by Defendants as part of the executive team at one or more of Defendants' restaurants, and he was assigned and performed the duties and responsibilities normally associated within the industry in the position known as Kitchen Manager, a position that (a) is considered to be managerial and executive in nature, (b) and that is usually compensated on a salaried basis."[41]  Silverman further opines that Bradley worked "mostly in management positions" and that "[h]is duties and responsibilities during his tenure with Defendants were typical of a restaurant management executive."[42]  Silverman then concludes that "[n]o matter how Mr. Bradley has tried to downplay his authority

---

[39]  Doc. 46-2 at 3.
[40]  *M.S. by & through Hall v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 129 (3d Cir. 2020).
[41]  Doc. 46-2 at 3.
[42]  *Id.* at 6.

while working for Defendants, the facts remain that he was 'in charge' of the Champs Downtown kitchen."[43]

These opinions do not help the trier of fact understand standards or customs in the restaurant industry as a whole. Instead, these opinions determine that Bradley's positions were managerial or executive, mirroring both the executive exemption's language and Defendants' brief supporting summary judgment. As such, the Court exercises its discretion to strike these unnecessary, unreliable legal conclusions as well.[44]

### 3.    Credibility Assessment

Silverman also finds Bradley's deposition testimony regarding his managerial authority "incredible."[45] But Silverman "is not competent to testify as to another witness's credibility."[46] "The Court therefore grants [Bradley's] motion to exclude [Silverman's] opinion of [his] credibility."[47]

---

[43] *Id.*

[44] *See Castagna v. W. Mifflin Area Sch. Dist.*, 502 F. Supp. 3d 992, 997 (W.D. Pa. 2020) (granting motion to strike expert report in part because "a significant portion of the Weiss Report is comprised not only of impermissible legal testimony, but recitations and/or characterizations of other evidence that are unnecessary to his expert opinion testimony and inappropriate"); *Coregis*, 2005 WL 2990694, at *5 ("In sum, the Court finds it inappropriate for Harrisburg to pass off this expert report as the objective analysis of purely factual issues concerning commercial liability policies when the heart of the report is awash in legal conclusions regarding the proper method of interpreting insurance contracts-and is filled with legal argument regarding the state of the law in Pennsylvania that bears a striking resemblance to the very arguments made by Harrisburg in its briefs filed in this case.").

[45] Doc. 46-2 at 6.

[46] *Suter v. Gen. Acc. Ins. Co. of Am.*, 424 F. Supp. 2d 781, 793 (D.N.J. 2006).

[47] *Id.*

Specifically, the following paragraph is stricken:

> In reviewing Mr. Bradley's deposition testimony, I noted that, according to him, he had minimal decision-making authority as Kitchen Manager of Champs Downtown.  Again, as asserted by him, he had to seek permission from either Mr[.] Lucchesi or Mr. Walker before being allowed to make any so-called management decisions.  I find such assertions as incredible, both from my own restaurant management experience but also from the deposition testimony of others.  For example, Walter Weaver, apparently a close friend and now business partner of Mr. Bradley, testified that Mr. Lucchesi only infrequently visited Champs Downtown, which is not surprising considering Mr. Lucchesi's other business interests and that he had some 500 employees under him.  Even Mr. Walker, who has a full-time job as owner and Kitchen Manager of the suburban Champs location, would appear at Champs Downtown only occasionally and then sometimes for only a few minutes.  To accept Mr. Bradley's assertions would be to acknowledge that the Champs Downtown kitchen ran without any effective management the vast majority of the time.  Again, from my substantial experience in the industry, this quite simply is not how restaurants are run.[48]

## IV.   MOTION TO STRIKE COUNTERSTATEMENT OF MATERIAL FACTS

Defendants also move to strike Bradley's counterstatement of material facts because it does not respond "to the numbered paragraphs set forth" in their own statement of material facts.[49]  But Local Rule 7.8(a) explicitly permits "a counter statement of the facts and of the questions involved and a counter history of the case."  Indeed, this Court has denied similar motions to strike plaintiffs' counterstatements of material facts.[50]

---

[48]  Doc. 46-2 at 6.
[49]  M.D. Pa. Local Rule 56.1.
[50]  *See Reid v. Sleepy's, LLC*, No. 3:14-CV-2006, 2016 WL 3345521, at *7 (M.D. Pa. June 16, 2016) ("Accordingly, Defendant's Motion to Strike Plaintiff's Counterstatement will be

Here, "[t]he manner in which the [P]laintiff replied to the [Defendants'] statement of material facts was appropriate and helpful to the court in citing relevant portions of the record."[51]   The Court "thus find[s] it unnecessary to strike the [counterstatement], and conclude[s] that striking the [counterstatement] and directing new filings by the Plaintiff would actually only serve to prolong this litigation and would otherwise be an inefficient and more confusing way to proceed."[52]   Defendants' motion to strike Bradley's counterstatement of material facts is denied.

## V.   MOTION FOR SUMMARY JUDGMENT

Next, Defendants move for summary judgment on all of Bradley's claims.   In his responsive brief, Bradley opposes Defendants' summary judgment motion and supports his cross-motion for summary judgment.[53]   But Bradley filed his response brief after the dispositive-motions deadline,[54] rendering any cross-motions for

---

denied."); *Stotler v. Commonwealth of Pa. Dep't of Corr.*, No. CIV.A.3:08-CV-1441, 2010 WL 2080029, at *13 (M.D. Pa. May 21, 2010) ("[T]he Motion to Strike will be denied."); *Dolan v. Cmty. Med. Ctr. Healthcare Sys.*, No. 06CV2365, 2008 WL 11499207, at *3 (M.D. Pa. Dec. 29, 2008) ("Plaintiff, in fact, has filed a response to the Defendant's statement of undisputed facts, as required by Rule 56.1. However, Defendant seems to insinuate that Plaintiff's filing of an additional counterstatement of fact is violative of Rule 56.1 because the facts contained therein should have been incorporated into Plaintiff's Rule 56.1 response. This position is simply incorrect.").

[51]   *Evans v. Lowe's Home Centers, Inc.*, No. 3:04CV0439, 2005 WL 2347246, at *4 (M.D. Pa. Sept. 26, 2005) (denying motion to strike plaintiff's counterstatement of material facts).

[52]   *Ball v. Buckley*, No. 1:11-CV-1829, 2012 WL 6681797, at *2 (M.D. Pa. Dec. 21, 2012) ("Mindful of these considerations, Dr. Famiglio's motion to strike the Plaintiff's counterstatements of fact will be denied.").

[53]   Doc. 52.

[54]   Docs. 45, 52.

summary judgment untimely.[55]   Accordingly, the Court "will treat the purported 'Cross–Motion' as simply a brief in opposition to [Defendants'] Motion."[56]

In sum, Defendants' motion for summary judgment is granted as to Bradley's FLSA and PMWA claims for overtime compensation.  But summary judgment is denied as to Bradley's FLSA retaliation claim.  Summary judgment is also denied as to Bradley's claim that Defendants breached an agreement to give sixty days' notice before termination.

## A.   Standard of Review

The Court begins its analysis of Defendants' motion for summary judgment with the standard of review.   "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses."[57]   The Supreme Court of the United States has advised that Federal Rule of Civil Procedure 56 "should be interpreted in a way that allows it to accomplish

---

[55]   *See Pittman v. Banks*, No. 3:17-CV-00443, 2020 WL 1531301, at *4 (M.D. Pa. Mar. 31, 2020) ("Because Plaintiff has not presented good cause for deviating from the Court's scheduling order, the Court will strike Plaintiff's Cross-Motion for Summary Judgment . . . as untimely. Because, however, Plaintiff has also captioned his brief in support of his Cross-Motion for Summary Judgment as his opposition brief to Defendants' Motion for Summary Judgment, which filing for the purpose of opposing summary judgment was permitted by court order, the Court will deny the motion as to Plaintiff's brief . . . ."); *Wall v. Dauphin Cnty.*, No. 1:04-CV-0238, 2006 WL 27123, at *3 (M.D. Pa. Jan. 5, 2006) ("On December 6, 2004, Plaintiff filed a brief in opposition to Defendants' motion for summary judgment and concurrently cross-moved for summary judgment. Plaintiff's purported cross-motion for summary judgment was filed three weeks after the dispositive motions deadline. Plaintiff has at all times been represented by counsel, at no time sought an extension of time to file a dispositive motion, and offered no excuse for filing the dispositive motion out of time. Accordingly, Plaintiff's cross-motion will be stricken as untimely.").

[56]   *Warrick v. Snider*, 2 F. Supp. 2d 720, 721 (W.D. Pa. 1997), *aff'd*, 191 F.3d 446 (3d Cir. 1999), *for text, see* No. 98-3010, 1999 WL 34590218 (3d Cir. Aug. 17, 1999).

[57]   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

this purpose."[58]  Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[59]

Material facts are those "that could alter the outcome" of the litigation, "and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[60]  A defendant "meets this standard when there is an absence of evidence that rationally supports the plaintiff's case."[61]  And a plaintiff must "point to admissible evidence that would be sufficient to show all elements of a *prima facie* case under applicable substantive law."[62]

A judge's task when "ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits."[63]  Thus, if "the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the

---

[58]  *Id.* at 324.
[59]  Fed. R. Civ. P. 56(a).
[60]  *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010) (quoting *Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993)).
[61]  *Clark*, 9 F.3d at 326.
[62]  *Id.*
[63]  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented."[64]

"The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]."[65]  Part of the judge's role at this stage is to ask "whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed."[66]  In answering that question, the Court "must view the facts and evidence presented on the motion in the light most favorable to the nonmoving party."[67]  The evidentiary record at trial will typically never surpass what was compiled during discovery.

The party requesting summary judgment bears the initial burden of supporting its motion with evidence from the record.[68]  For example, while "at the motion-to-dismiss stage of proceedings a district court is obligated to accept the allegations in a plaintiff's complaint as true, it does not accept mere allegations as true at the summary judgment stage."[69]  The moving party must identify those portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together

---

[64]  *Id.*
[65]  *Daniels v. School Dist. of Philadelphia*, 776 F.3d 181, 192 (3d Cir. 2015) (quoting *Liberty Lobby*, 477 U.S. at 252 (alterations in original)).
[66]  *Liberty Lobby*, 477 U.S. at 252 *(*quoting *Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 442, 447 (1871) (alteration and emphasis in original)).
[67]  *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 144 (3d Cir. 2020).
[68]  *Celotex*, 477 U.S. at 323.
[69]  *Wiest v. Tyco Electronics Corp.*, 812 F.3d 319, 330 (3d Cir. 2016).

with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."[70]  "Regardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."[71]

For movants and nonmovants alike, the assertion "that a fact cannot be or is genuinely disputed" must be supported by: (1) citations to particular parts of materials in the record that go beyond mere allegations; (2) a showing that the materials cited do not establish the absence or presence of a genuine dispute; or (3) a display that an adverse party cannot produce admissible evidence to support the fact.[72]

Summary judgment is effectively "put up or shut up time" for the nonmoving party.[73]  When the movant properly supports his motion, the nonmoving party must show the need for a trial by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[74]  The nonmoving party will not withstand summary judgment if all it has are "assertions, conclusory allegations, or mere suspicions."[75]  Instead, it must

---

[70]  *Id.* (internal quotations omitted).
[71]  *Id.*
[72]  Fed. R. Civ. P. 56(c)(1).
[73]  *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006) (Fisher, J.).
[74]  *Liberty Lobby*, 477 U.S. at 250.
[75]  *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).

"identify those facts of record which would contradict the facts identified by the movant."[76]  Moreover, "if a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)" the Court may "consider the fact undisputed for purposes of the motion."[77]  On a motion for summary judgment, "the court need consider only the cited materials, but it may consider other materials in the record."[78]

Finally, "at the summary judgment stage[,] the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."[79]  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[80]

## B.    Analysis

### 1.    Overtime Compensation

Defendants move for summary judgment on Bradley's claims for overtime compensation under the FLSA and PMWA.  "Pennsylvania courts have looked to federal law regarding the Fair Labor Standards Act ('FLSA') for guidance in applying the PMWA."[81]  So the Court will analyze Bradley's overtime claims under the FLSA and PMWA together.

---

[76]  *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co*., 311 F.3d 226, 233 (3d Cir. 2003).
[77]  Fed. R. Civ. P. 56(e)(2); *see also Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613–14 (3d Cir. 2018).
[78]  Fed. R. Civ. P. 56(c)(3).
[79]  *Liberty Lobby*, 477 U.S. at 249.
[80]  *Id*. at 249–50 (internal citations omitted).
[81]  *Baum v. Astrazeneca LP*, 372 F. App'x 246, 248 (3d Cir. 2010).

The FLSA exempts "any employee employed in a bona fide executive, administrative, or professional capacity" from overtime compensation.[82]  "FLSA exemptions must be construed narrowly against the employer . . . ."[83]  "The burden is on the employer to establish that the remuneration in question falls under an exemption."[84]

> The term 'employee employed in a bona fide executive capacity' in section 13(a)(1) of the Act shall mean any employee: (1) Compensated on a salary basis . . . at a rate of not less than $684 per week . . .; (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof; (3) Who customarily and regularly directs the work of two or more other employees; and (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.[85]

Here, the parties agree that Bradley earned at least $684 a week.  But they dispute the second, third, and fourth requirements.[86]  The Court analyzes each disputed requirement in turn.

---

[82]  29 U.S.C. § 213(a)(1).

[83]  *Mazzarella v. Fast Rig Support, LLC*, 823 F.3d 786, 790 (3d Cir. 2016).

[84]  *Madison v. Res. for Hum. Dev., Inc.*, 233 F.3d 175, 187 (3d Cir. 2000).

[85]  29 C.F.R. § 541.100(a).

[86]  Doc. 52 at 11 ("Here, Mr. Bradley's employment does not satisfy the second, third, or fourth prong to be properly exempt from overtime compensation.").

### a. Primary Duty Was Management

The second requirement is that Bradley's "primary duty [was] management of the enterprise in which the employee [was] employed or of a customarily recognized department or subdivision thereof[.]"[87]  Under 29 C.F.R. § 541.102,

> 'management' includes, but is not limited to, activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

By Bradley's own account, he performed many of these management activities.  Bradley twice answered an interrogatory by stating that he "would interview the applicants . . . ."[88]  Bradley also answered that he "trained the supervisors" and "oversaw the training process."[89]  Bradley further answered that "[w]hen Defendant[s'] business was busy, [he] would designate work[.]"[90]

---

[87]  29 C.F.R. § 541.100(a)(2).
[88]  Doc. 49-5 at 9–10.
[89]  *Id.* at 10.
[90]  *Id.*

And in his deposition, Bradley testified, "Did I supervise them? Yes. I oversaw what they were doing."[91]  Bradley further testified that he supervised "an average of five to ten people" in the afternoon and night.[92]  Besides kitchen employees, Bradley also supervised "[a]ll the people that were working back there" in the "back of the house."[93]  And Bradley did inventory and ordered food on Defendants' behalf.[94]

Moreover, the record includes numerous schedules that Bradley prepared for employees.[95]  The record also includes numerous disciplinary write-ups that Bradley issued to other kitchen employees.[96]  This evidence all demonstrates that Bradley performed management duties.

Indeed, management was Bradley's primary duty.  To determine an employee's primary duty, courts consider "the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee."[97]

---

[91]   Doc. 52-2 at 33.
[92]   *Id.* at 33–34.
[93]   *Id.* at 34.
[94]   *Id.* at 32–33.
[95]   Doc. 49-6 at 38–63.
[96]   *Id.* at 65–96.
[97]   29 C.F.R. § 541.700(a).

Here, "it is clear that the restaurants could not operate successfully unless the managerial functions of [Bradley], such as . . . scheduling employees, keeping track of inventory, and assigning employees to particular jobs, were performed."[98] "The importance of such functions suffices to make them [Bradley's] 'primary duty.'"[99]

Defendants also adduce evidence that Bradley earned $800 to $1,050 a week when other kitchen employees earned $400 to $560 a week.[100] Bradley does not adduce evidence disputing these figures.[101] So Bradley earned substantially more than other kitchen employees did, further indicating that his primary duty was management.[102]

Bradley also testified that before joining Champs, he "became a kitchen manager" at Hard Times Café and "was a kitchen manager" at Your Game Sports Bar and Grill.[103] Bradley's prior "experience as the kitchen manager . . . logically accords with his playing a predominantly managerial role in the kitchen."[104] Accordingly, Bradley's principal duty was management.

---

[98] *Donovan v. Burger King Corp.*, 675 F.2d 516, 521 (2d Cir. 1982) ("For that reason, as well as the fact that much of the oversight of the operation can be carried out simultaneously with the performance of non-exempt work, we believe the principal or most important work of these employees is managerial.").

[99] *Guthrie v. Lady Jane Collieries, Inc.*, 722 F.2d 1141, 1144 (3d Cir. 1983).

[100] Doc. 49-6 at 36, 121, 129–30.

[101] Docs. 52, 53, 54.

[102] *See Soehnle v. Hess Corp.*, 399 F. App'x 749, 752 (3d Cir. 2010) (affirming summary judgment in defendant-employer's favor when plaintiff-employee was "was making 40% more than the hourly-wage employees at the site").

[103] Doc. 52-2 at 9–10.

[104] *Yeh v. Han Dynasty, Inc.*, No. 18 CIV. 6018 (PAE), 2020 WL 883501, at *10 (S.D.N.Y. Feb. 24, 2020).

Bradley counters that most of his "job duties throughout his entire employment consisted of physically-intensive menial tasks related to cooking food."[105]    But the United States Court of Appeals for the Third Circuit has "recognized that an employee need not spend the majority of his time performing managerial tasks in order to be considered exempt."[106]   Accordingly, Bradley's time cooking does not suffice to create a genuine dispute of material fact as to his principal duty of management.

Bradley further counters that if he was an executive, it was only after he became the per se Kitchen Manager in August 2019.[107]   Besides this period before August 2019, Bradley does not propose other alternative periods of overtime eligibility.[108]   Still, Bradley's counterargument fails for several reasons.

Even before August 2019, Bradley wrote up numerous employees.[109]   And even as Assistant Kitchen Manager, Bradley "assur[ed] that people who worked in their stations were doing their jobs correctly."[110]   So Bradley's principal duty was management even before he became per se Kitchen Manager in August 2019.

Regulatory language confirms this conclusion.  Under 29 C.F.R. § 541.106(b), "an assistant manager in a retail establishment may perform work such as serving

---

[105]  Doc. 52-2 at 12.
[106]  *Itterly v. Fam. Dollar Stores, Inc.*, 606 F. App'x 643, 646  (3d Cir. 2015).
[107]  Doc. 52 at 18.
[108]  Docs. 52, 61.
[109]  Doc. 49-6 at 65–96.
[110]  Doc. 52-2 at 30.

customers, cooking food, stocking shelves and cleaning the establishment, but performance of such nonexempt work does not preclude the exemption if the assistant manager's primary duty is management."   And under 29 C.F.R. § 541.700(c), "assistant managers in a retail establishment who perform exempt executive work such as supervising and directing the work of other employees, ordering merchandise, managing the budget and authorizing payment of bills may have management as their primary duty . . . ."

Such examples illustrate that assistant managers may be exempt executives as well.  So Bradley was an exempt executive not just as per se Kitchen Manager, but also as Assistant Kitchen Manager.  Defendants have met their burden as to the second requirement.

### b.    Directed Multiple Employees' Work

The third requirement is that Bradley "customarily and regularly direct[ed] the work of two or more other employees."[111]   "The phrase 'customarily and regularly' means a frequency that must be greater than occasional but which, of course, may be less than constant.  Tasks or work performed 'customarily and regularly' includes work normally and recurrently performed every workweek; it does not include isolated or one-time tasks."[112]

---

[111]  29 C.F.R. § 541.100(a)(3).
[112]  29 C.F.R. § 541.701.

In his deposition, Bradley testified that he "assur[ed] that people who worked in their stations were doing their jobs correctly" at Champs Downtown.[113]  Bradley also testified, "Did I supervise them? Yes. I oversaw what they were doing."[114] Bradley further testified that he supervised "an average of five to ten people" in the afternoon and night.[115]  Besides kitchen employees, Bradley also supervised "[a]ll the people that were working back there" in the "back of the house."[116]

In an interrogatory, Bradley responded that "[w]hen Defendant[s'] business was busy, [he] would designate work[.]"[117]  Bradley further responded that he "trained the supervisors" and "oversaw the training process."[118]  Moreover, the record includes numerous schedules that Bradley prepared for employees.[119]

Such evidence all demonstrates that Bradley customarily and regularly directed the work of two or more other employees.[120]  Accordingly, Defendants have met their burden as to the third requirement as well.

---

[113] Doc. 52-2 at 30.

[114] *Id.* at 33.

[115] *Id.* at 33–34.

[116] *Id.* at 34.

[117] Doc. 49-5 at 10.

[118] *Id.*

[119] Doc. 49-6 at 38–63.

[120] *See Del Valle v. Officemax N. Am.*, 680 F. App'x 51, 63 (3d Cir. 2017) ("OfficeMax has also met prongs two and three of the bona fide executive test, as demonstrated by our analysis above with respect to the NLRA."); *In re Fam. Dollar FLSA Litig.*, 637 F.3d 508, 513 (4th Cir. 2011) ("As to factor (3), Grace did in fact customarily and regularly direct the work of two or more other employees."); *Guthrie*, 722 F.2d at 1148 ("The second prong of the 'short test,' customary direction of two or more employees, is established by the undisputed fact that he was in command of the entire mine during third shift. We therefore agree with and affirm the district court's holding that Hamilton was an exempt 'executive.'"); *Yeh*, 2020 WL 883501, at *11 ("Substantially for the reasons reviewed above, defendants have also established the second 'duty factor'—that Yeh regularly supervised two or more employees.").

Bradley counters by citing regulatory language that "[a]n employee who merely assists the manager of a particular department and supervises two or more employees only in the actual manager's absence does not meet this requirement."[121] But the deposition testimony and interrogatory answers above do not indicate that Bradley only supervised employees in the actual manager's absence.   So § 541.104(c)'s regulatory language does not save Bradley's overtime-compensation claim here.

### c.   Suggestions Carried Particular Weight

The fourth requirement is that Bradley had "the authority to hire or fire other employees or" that Bradley's "suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees [were] given particular weight."[122]   "To determine whether an employee's suggestions and recommendations are given 'particular weight,' factors to be considered include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon."[123]

In *Del Valle v. OfficeMax North America*, the plaintiff-employee "admitted during his deposition that, on at least two occasions, he interviewed candidates" and

---

[121]   29 C.F.R. § 541.104(c).
[122]   29 C.F.R. § 541.100(a)(4).
[123]   29 C.F.R. § 541.105.

"affirmed that he 'had at least some responsibility. . . in holding associates accountable' for policy violations and could 'recommend corrective action if it was appropriate[.]'"[124]   This persuaded the Third Circuit that OfficeMax gave the plaintiff-employee's suggestions and recommendations as to the hiring and hiring of other employees particular weight.[125]   So the Third Circuit affirmed summary judgment in OfficeMax's favor.[126]

Similarly, in *Yeh v. Han Dynasty, Inc.*, the plaintiff-employee "testified that on at least 10 occasions, he made complaints . . . about the performance of kitchen workers."[127]   His "reply declaration added that he had recommended to . . . hire" another employee.[128]   The United States District Court for the Southern District of New York held that the "undisputed evidence therefore supports that [the plaintiff-employee] made recommendations as to hiring and firing that carried weight . . . ."[129]

Likewise, Bradley repeatedly answered an interrogatory by stating that he "would interview the applicants . . . ."[130]   And the record includes numerous disciplinary write-ups that Bradley issued to other kitchen employees.[131]   Indeed, Bradley testified in his deposition that he was "responsible for informing senior

---

[124]  680 F. App'x at 63–64.
[125]  *Id.* at 63.
[126]  *Id.* at 64.
[127]  2020 WL 883501, at *12.
[128]  *Id.*
[129]  *Id.*
[130]  Doc. 49-5 at 9–10.
[131]  Doc. 49-6 at 65–96.

management if employees were not performing correctly[.]"[132]   Bradley further testified that he would "recommend from time to time whether or not an employee should be terminated or disciplined" and "would, from time to time . . . suggest to the people to whom [he reported] what should happen to an employee in the kitchen."[133]

Moreover, Bradley testified that he "suggested that Champs hire Walter Weaver" and "made a suggestion of him being hired . . . ."[134]   Upon Bradley's recommendation, Champs hired Weaver.[135]   Because Bradley interviewed candidates, wrote up kitchen employees, recommended employees' termination and discipline, and successfully suggested hiring Walter Weaver, Bradley's suggestions and recommendations carried particular weight.

Bradley counters that "he could not discipline employees at his own sole discretion."[136]   But "[a]n employee's suggestions and recommendations may still be deemed to have 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status."[137]   So Bradley's

---

[132]   Doc. 52-2 at 34.
[133]   *Id.*
[134]   *Id.* at 43, 57.
[135]   *Id.* at 43.
[136]   Doc. 52 at 15.
[137]   29 C.F.R. § 541.105.

disciplinary suggestions and recommendations had particular weight even if they required further approval.

Defendants have met their burden as to each of the four requirements. As an executive employee, Bradley was exempt from overtime compensation. Accordingly, Defendants' motion for summary judgment is granted as to Bradley's FLSA and PMWA claims for overtime compensation.

### 2. FLSA Retaliation

Defendants also move for summary judgment on Bradley's FLSA retaliation claim. "In order to establish a prima facie case of discriminatory retaliation, a plaintiff must show that (1) the plaintiff engaged in protected activity, (2) the employer took an adverse employment action against her, and (3) there was a causal link between the plaintiff's protected action and the employer's adverse action."[138] The Court addresses each element in turn.

### a. Protected Activity

Defendants argue that Bradley never notified them that he believed that he had a legal right to overtime compensation. "To fall within the scope of the antiretaliation provision, a complaint must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an

---

[138] *Preobrazhenskaya v. Mercy Hall Infirmary*, 71 F. App'x 936, 939 (3d Cir. 2003).

assertion of rights protected by the statute and a call for their protection."[139]  "This standard can be met, however, by oral complaints, as well as by written ones."[140]

In his deposition, Bradley testified that he complained to Kitchen Manager Michael Markley "because of overtime."[141]  Bradley "would ask Markley if [he was] going to be working a certain amount of hours, why wouldn't [he] be paid for that in overtime?"[142]  Bradley also testified that he complained to Walker, Lucchesi, and Assistant General Manager Mary Weaver "about the fact that [he wasn't] getting paid for overtime."[143]

At Champs Downtown, Bradley again complained to Walker and Lucchesi about "not getting paid overtime."[144]  Bradley also asked for "documentation of how many hours [he] worked," including a "[a] printout for all [the] hours that [he] worked."[145]  From these recurring complaints, a reasonable juror could find that Bradley notified Defendants that he felt he had a legal right to overtime compensation.[146]

---

[139] *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 14 (2011).
[140] *Id.*
[141] Doc. 52-2 at 27.
[142] *Id.*
[143] *Id.* at 35.
[144] *Id.* at 61.
[145] *Id.* at 62.
[146] *See Bedolla v. Brandolini*, No. CV 18-146, 2018 WL 2291117, at *7 (E.D. Pa. May 18, 2018) ("The Supreme Court held that a formal written complaint is not required; rather, an informal oral complaint made by an employee to a supervisor constitutes protected activity within the meaning of the statute.") (citing *Kasten*, 563 U.S. at 17).

### b.    Adverse Action

Defendants also argue that Bradley resigned instead of being terminated.  But in his deposition, Bradley testified that "[o]n that Sunday, the last day of my employment there, I was called out of the kitchen and I was fired or let go."[147]  This testimony creates a factual dispute about whether Defendants terminated Bradley or whether Bradley resigned.  So the Court cannot grant summary judgment on the basis that Bradley resigned.

### c.    Causal Link

Finally, Defendants argue that Bradley fails to proffer evidence of a causal connection between his complaints and his termination.  The Third Circuit has held "that temporal proximity between the protected activity and the termination is sufficient to establish a causal link."[148]  When "a plaintiff engages in multiple protected activities,"[149] courts may analyze temporal proximity between the termination and the last protected activity.[150]

---

147  Doc. 52-2 at 5.
148  *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997).
149  *Reyer v. Saint Francis Country House*, 243 F. Supp. 3d 573, 587–88 (E.D. Pa. 2017).
150  *See Wiest v. Tyco Elecs. Corp.*, 812 F.3d 319, 332 (3d Cir. 2016) ("As noted, Wiest last engaged in protected activity on October 10, 2008, and the adverse employment action with respect to the preliminary determination to terminate him occurred in September 2009."); *Urey v. Grove City Coll.*, 94 F. App'x 79, 81 (3d Cir. 2004) ("Finally, the last instance in which Ms. Urey filed a claim for workers' compensation benefits occurred on October 4, 2000–six months before her termination."); *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 178 (3d Cir. 1997) ("Moreover, Kachmar claims she was advised by Pedrick to start looking for another job in October, 1993, only several months after her last protected activity. Her allegation that she was told her position had been offered to a male in November, 1993, shortly after her meeting with Pedrick, would, if proven, show that SunGard had resolved to discharge her shortly after the latest activity."); *Doe v. Apria Healthcare Grp. Inc.*, 97 F. Supp. 3d 638, 648

Here, Bradley testified that Defendants terminated him on February 9, 2020, just weeks after he last complained about not receiving overtime compensation.[151] Moreover, Defendants refused to allow Walter Weaver to return to work "due to [his] boy and what he's doing to us," referring to Bradley.[152]   This antagonism toward Walter Weaver because of Bradley, coupled with the temporal proximity between Bradley's last complaints and alleged termination, sufficiently indicate causation.[153]   Accordingly, Defendants' motion for summary judgment is denied as to Bradley's FLSA retaliation claim.

### 3.    Notice of Termination

Though Defendants move for summary judgment on "all claims in this action,"[154] Defendants' briefs do not address Bradley's claims that they breached an agreement to give sixty days' notice before terminating him.[155]   Perhaps Defendants rest on their assertion that Bradley resigned instead of being terminated.   But as the

---

(E.D. Pa. 2015) ("The latest discrete complaint occurred in November 2011, when Plaintiff spoke to Smith.").

[151]   Doc. 52-2 at 61–62.

[152]   *Id.* at 147–49.

[153]   *See Marra v. Philadelphia Hous. Auth.*, 497 F.3d 286, 306 (3d Cir. 2007), *as amended* (Aug. 28, 2007) ("Suffice it to say that the jury could have reasonably inferred the requisite causal connection based on the close temporal proximity between DiGravio testifying at the *Paladino* trial and his transfer to the Section 8 Department approximately six weeks later, coupled with the antagonism experienced by Marra, a fellow witness, in the weeks that immediately followed the trial."); *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000) (noting that in a previous case, "the plaintiff had established a prima facie case of retaliation based on temporal proximity between the events plus inconsistencies in the defendant's testimony, certain conduct towards others, and refusals to provide a reference for the plaintiff") (citation omitted).

[154]   Doc. 49.

[155]   Docs. 50, 56.

Court explained above, a factual dispute exists about whether Defendants terminated Bradley, precluding summary judgment on the basis that Bradley resigned.

Regardless, Defendants have not briefed Bradley's claims about sixty days' notice.  So Defendants' motion for summary judgment is denied as to these WPCL and breach-of-contract claims.[156]

## VI.   CONCLUSION

Bradley's motion to strike Defendants' expert report and expert witness is denied in part and granted in part.   Defendants' motion to strike Bradley's counterstatement of material facts is denied.  And Defendants' motion for summary judgment is granted in part and denied in part.

An appropriate Order follows.

BY THE COURT:


_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge

---

[156] *See H2L2 Architects/Planners, LLC v. Tower Invs., Inc.*, No. CIV.A. 12-6927, 2014 WL 3843878, at *5 (E.D. Pa. Aug. 4, 2014) ("In light of those factual issues, and the incomplete manner in which both parties have briefed the propriety of Plaintiff's Payment Act claim, Plaintiff's Motion for Partial Summary Judgment as to that claim is denied."); *Finnegan v. Wilton Reassurance Life Co. of New York*, No. CV 07-4071 (AET), 2009 WL 10728518, at *3 (D.N.J. Feb. 20, 2009) ("Because Defendant's brief does not address the elements of a claim for breach of a fiduciary duty under New Jersey law, the Court denies Defendant's motion with respect to Count II and proceeds to consider Defendant's motion with respect to Counts III and IV."); *Globespanvirata, Inc. v. Texas Instruments, Inc*, No. CIV. 03-2854GEB, 2005 WL 3077915, at *11 (D.N.J. Nov. 15, 2005) ("As for the remaining claims of the '322 Patent, Defendants have not provided the Court with sufficient substantive arguments in their briefs for the Court to reach the issue of whether each and every other limitation of the asserted claims is found in the accused products. As such, the Court will not address these limitations. Consequently, summary judgment of infringement as to those claim limitations is denied.").